FILED

2025 JAN 21 PM 2: 27

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES
BY: _____

Dan Andreiu, Plaintiff *in propria persona*
Phone (310) 414 7177
Fax: (310) 861 1600
Email: dan@andreiu.com
Mailing address: P.O. Box 93562,
Los Angeles, CA 90093

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| DAN ANDREIU,<br><br>1 to 10,0000,000 included<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC., ROSS DITLOVE,<br><br>1 to 10 included.<br><br>Defendant(s), | Case No. CV25-520-DDP(SScx)<br><br>**Verified Complaint**<br>**Class Action Statue and Jury Trial demanded**<br><br>1) **Monopolistic Practices**<br><br>2) **Forced or Coerced Labor Under Minimum Wage**<br><br>3) **Unlawful Termination**<br><br>4) **Fraud**<br><br>5) **Hostile Work Environment**<br><br>6) **Intentional Infliction of Emotional Distress**<br><br>7) **Breach of Contract** |

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to **28 U.S.C. § 1331**, as the claims arise under federal law, including but not limited to violations of labor statutes and antitrust laws.

2. Venue is proper in this district under **28 U.S.C. § 1391**, as Defendants conduct business in this district and the events giving rise to the claims occurred within this district.

**THE PARTIES:**

- **DAN ANDREIU**, Plaintiff, is an award-winning inventor and filmmaker who has experienced financial hardship due to the Small Business Administration's refusal to provide pandemic assistance. This refusal, contrary to Congressional instructions, was based on his companies' classification as startups, rendering them ineligible for relief. As a result, Plaintiff was forced to work as an Uber driver to maintain financial stability while pursuing his startup projects. For the purposes of this complaint, Plaintiff operated as an independent contractor providing services for Uber Technologies, Inc., Defendant, an internet ridesharing platform.

- **UBER TECHNOLOGIES, INC.** (Uber), Defendant, claims to be an internet services provider facilitating ridesharing services. However, Uber operates as a de facto taxi company—a near-monopoly employer—disguised as an internet platform. Notably, Uber provides commercial insurance to its drivers. Uber's "Terms of Service" constitute fraudulent employment practices, enabling it to operate despite widespread complaints and ongoing litigation.

- **ROSS DITLOVE**, Defendant (Ross), is a Los Angeles County resident and venture capitalist. On December 13, 2024, he requested delivery services from Uber Technologies, Inc., which were performed by Plaintiff Dan Andreiu.

**THE FACTS:**

On Friday, December 13, 2024, at approximately 8:40 PM, Plaintiff received an Uber delivery offer to deliver to Defendant Ross at 340 The Strand, Hermosa Beach, California. The quoted price for this 16-minute delivery was $8.27, including an undisclosed tip from Defendant Ross. Plaintiff, an independent contractor, accepted the delivery.

The delivery location was a dark, obstructed driveway behind the residence, facing the ocean. Following the Uber app's instructions (including a picture of the delivery location), Plaintiff delivered the package to a door in an alleyway. This door resembled the one in the app, but the actual main entrance, obscured from the alley, was a similarly designed side entrance.

Plaintiff briefly waited, monitoring the Uber app. Suspecting a problem, he ensured proper delivery. He encountered Defendant Ross in the alley, who appeared confused. After Plaintiff indicated the package's location, Defendant Ross expressed frustration at the delivery location, stating "Look again." Plaintiff, already departing, again showed the location, then left.

Plaintiff subsequently learned that he received only $2.27 for the 16-minute delivery (see Exhibit 1), using his $70,000 electric vehicle. An Uber message stated that the tip had been reduced to zero, despite the original quoted price of $8.27.

The following day, Plaintiff unexpectedly encountered Defendant Ross. When questioned about the unpaid tip, Ross responded, "You got what you deserved" and "You are paid by Uber anyway." Upon learning the actual amount Uber paid, Ross dismissively said, "Get a better job…"

Within minutes, Defendant Ross filed a complaint with Uber against Plaintiff (see Exhibit 2), resulting in Uber's immediate and unexplained disconnection of Plaintiff's account. Plaintiff is appealing this termination, citing Uber's arbitrary and abusive termination practices, which are now subject to legal challenge.

Years prior, Plaintiff owned a high-end vehicle dealership (High End Cars, Inc.). However, he closed it to focus on his patented inventions, film projects, and other ventures. In 2013, he established an Uber driver account as financial insurance for periods of low income related to his ventures. Despite his qualifications and skills, his entrepreneurial endeavors necessitated income flexibility, a need uniquely met by Uber driving.

The COVID-19 pandemic and SBA policies negatively impacted Plaintiff's startup ventures. In 2018, unauthorized access resulted in the disconnection of his Uber account. In 2020, he sought to use this account to meet his financial needs. Uber only reinstated his account in 2024 after Plaintiff engaged their legal department.

Significantly, Plaintiff developed a business model similar to Uber's in the early 2000s, even registering HighEndLimo.com. His computer science degree underpinned his technological development. He chose to pursue other ventures, however. This demonstrates that Uber's business model lacked originality.

Uber's business model, while seemingly technology-based, actually extracts roughly 70% of driver earnings—far exceeding the initial 20% required for system operation. This is enabled by a large workforce of employees performing superficial tasks under the guise of safety, thus artificially inflating Uber's market valuation. This resembles Elon Musk's recent actions at Twitter, where significant staff reductions did not impair operational efficiency.

Uber leverages this "lip service" staff to manipulate drivers through its "Terms of Service," creating a cycle of threats, reassignments, and terminations, forcing drivers to work below minimum wage. While Proposition 22 offered some relief, the fundamental problem persists: Uber drivers, as independent contractors, lack employee protections and rights, rendering them vulnerable to exploitation. Uber exerts complete control, establishing a de facto fiduciary relationship and servitude, without employee benefits. Drivers face constant threats of disconnection at whim for minor or invented infractions, working so in an environment of terror.

Uber's practices constitute a fraudulent system maximizing profits at the expense of its drivers, creating tension between drivers and clients. When conflicts arise, drivers are readily terminated, benefiting Uber while harming the drivers.

Uber emerged as a way to empower the individual driver—and was perceived as such in its early days. Plaintiff saw it this way when he registered **HighEndLimo.com** with a similar intent. Since Plaintiff allowed others to pursue this opportunity two decades ago, he now feels a moral responsibility to restore the original intent of internet-based ride-sharing. Unfortunately, it has now turned into a novel way to enslave and exploit drivers to the maximum extent possible and defraud American society of an entire segment of the economy that once provided an opportunity

for any marginally skilled individual to earn a living. With novel concepts that do not exist in established business law, such as "platforms," instead of businesses, Uber promotes "woke" philosophy concepts like "safety," which serve as an excuse to exploit, intimidate and defraud the individual driver of his rights under the law as an independent contractor. This deprives him of the rights he would have as an employee, even though in practice, drivers are treated as employees. Uber, Lyft Inc., have set the prices and all terms in minute detail through fraudulent so-called "Terms of Service" that are imposed due to their monopolistic power. Uber is, in fact, a monopoly. By flexing its enormous financial and political muscle, Uber has managed to fool the public into believing that it is a law-abiding business. A "platform" is not a business entity, but rather Uber's creation to evade its responsibilities under the law. Yet, Uber claims it is a corporation and asserts that it does business with drivers as independent contractors while controlling every aspect of the business relationship through its "Terms of Service." These terms create a fiduciary duty, making drivers effectively employees without offering them any rights under the law.

Uber changes drivers with its so-called "Terms of Service" almost weekly, yet it takes an individual a week to properly review them. Drivers have no other choice but to accept these terms. Uber uses its monopolistic power to force drivers to comply, rendering these ever-changing "Terms of Service" void and null. Drivers have no chance to negotiate these terms, while Uber claims that drivers are independent contractors. In reality, drivers are forced to work under conditions that deprive them of their right to earn a federally recognized minimum wage, taking into account their using own tools (vehicles), vehicle expenses, and downtime while waiting for passengers or packages.

Uber publicly claims that it makes no profit, but the obvious reality is that it makes huge profits, as seen in its new and impressive headquarters.

The astonishing fact is that Uber, Lyft Inc., and similar companies receive government subsidies for using electric vehicles—vehicles that drivers pay for through rental companies at market price. Uber exploits these subsidies, claiming the vehicles are "theirs" in the context of the relationship with drivers while pocketing the subsidies with drivers' tax money. This creates a situation where drivers are paying for the vehicles themselves, using their own tax money to pay for their small income, while Uber pockets all the profits, claiming control and ownership on top of it. This is an amazing occurrence that largely goes unnoticed.

Having driven for Uber and Lyft, Plaintiff determined that Uber and Lyft pocket all the revenue from customers, while drivers are paid with their own tax money through various programs, like transportation for senior citizens or clean energy initiatives.

Uber and Lyft set the prices on their platforms, and in 2024, there was an attempt at a strike by drivers due to the steadily decreasing rates. This coincided with the Biden administration's policy of allowing a surge of immigrants, who compete for these entry-level jobs, further reducing wages for American citizens. Uber and Lyft are exploiting this fraudulent migration to transform low-skilled American workers into virtual slaves, deprived of their rights under the law, as described above, and coerced to work for less than the federally recognized minimum wage.

**CAUSES OF ACTION**

1.  **Breach of Contract**: Defendant Ross breached the contract by failing to pay the agreed-upon tip for a successfully completed delivery. The delivery was fully completed, and Plaintiff took extra steps to ensure Ross received the package. Withholding the full agreed-upon tip constitutes a breach of contract and an abuse of discretion.

2.  **Intentional Infliction of Emotional Distress**: Defendant Ross intentionally caused emotional distress through humiliating and belittling remarks, and failure to pay the promised tip. His subsequent judgmental comments about Plaintiff's financial situation indicate deliberate intent to inflict harm. It is notable that Ross, a venture capitalist, profits from ventures similar to those Plaintiff is developing.

3.  **Wrongful Termination**: Defendant Uber wrongfully terminated Plaintiff's account without cause, in retaliation for Defendant Ross's complaint. This is a direct result of Uber's exploitative and abusive business practices.

4.  **Fraud**: Uber claims it needs to take about 70% of driver income to operate the business, but in fact, Uber hires a redundant army of employees who perform minimal tasks. These employees oppress and coerce drivers while Uber arbitrarily disconnects drivers through its "security department" to maximize profits. In 2020, Plaintiff tried for two years to reach Uber's "security department" to present his side of the story, without success. Uber's disconnection decisions are arbitrary, secretive, and final. Only after engaging their legal department was Plaintiff able to argue for reinstatement. Most drivers lack the legal sophistication to challenge Uber's arbitrary practices.

5.  **Hostile Work Environment**: The purpose of Uber's army of "lip service" employees is to coerce drivers into working for less than the federally recognized minimum wage while brainwashing them with "woke" excuses to justify exploitation. Lyft, for example,

uses pleasant driving instructions heard by both drivers and passengers. Uber, in contrast, instructs drivers to use an earpiece so only the driver hears commands, which are often demeaning and abusive.

6. **Forced or Coerced Labor Under Minimum Wage**: Plaintiff was coerced into providing labor under the federally recognized minimum wage considering that he had to pay for the rental vehicle provided by Uber and the downtime while waiting for passengers/packages.

7. **Monopolistic Tactics**: Uber is a monopoly that uses its power to impose "Terms of Service" that change frequently, leaving the Plaintiff with no realistic opportunity to review or negotiate these terms. Uber imposes prices that drivers, as independent contractors, are forced to accept.

## PRAYER

Plaintiff DAN ANDREIU requests judgment against the defendants:

1. **Against Defendant Ross**: $6 in compensatory damages for breach of contract; $1,000,000 in punitive damages for intentional infliction of emotional distress; $1,000,000 in compensatory damages for loss of income due to abusive actions; and $10,000,000 in punitive damages for malicious intent to punish Plaintiff.

2. **Against Defendant Uber**: $2,000,000 in compensatory damages for wrongful termination (in two separate incidents); $10,000,000 in punitive damages for malicious intent to instill fear and control its drivers through deceptive justifications.

3. **Against Defendant Uber**: Restauration of Plaintiff's account on Defendant Uber
   ridesharing platform, permanently disconnected on January 6, 2025, (see Exhibit 3).

4. **Request for Injunction Regarding Independent Contractor Pricing**

Plaintiff realleges and incorporates by reference all preceding paragraphs.

Plaintiff requests that the Court issue an injunction ordering Defendant Uber Technologies,
Inc. to allow drivers, as independent contractors, to determine the hourly rate or price they
are willing to accept for their services on the Uber platform. Currently, Uber, using its
monopolistic power, sets prices, which undermines the drivers' rights to set their own rates
as independent contractors. Plaintiff asserts that this practice is inconsistent with the legal
status of drivers as independent contractors, and that the market should determine the value
of drivers' work rather than Uber setting prices. As a result, Plaintiff requests that the Court
mandate Uber to allow drivers to establish their own rates for services rendered on the
platform.

5. **Request for Injunction Regarding Driver Control Over Pricing and Independent
   Contractor Status**

Plaintiff realleges and incorporates by reference all preceding paragraphs.

Plaintiff further requests that the Court issue an injunction requiring Uber Technologies,
Inc. to allow drivers, as independent contractors, to have the ability to set their own prices
for their services on the platform. Plaintiff asserts that under the law, drivers must retain
the ability to negotiate and establish their rates, and that Uber's practice of dictating
prices constitutes an unlawful interference with the drivers' legal rights. Furthermore,

Plaintiff contends that Uber, through its monopoly power, is violating the independence of the contractors, as Uber is unlawfully controlling the pricing structure and preventing drivers from exercising their rights under their independent contractor status.

6. **Request for Injunction Allowing Direct Client-Driver Interaction**

Plaintiff realleges and incorporates by reference all preceding paragraphs.

Plaintiff requests that the Court issue an injunction mandating that Uber Technologies, Inc. allow customers (clients) to select or reserve services from a particular driver at a specific time, rather than prohibiting such arrangements. Plaintiff asserts that Uber, as a platform, should not be controlling the client-driver relationship to the extent it does. While Uber claims it is merely a platform and not an employer, Uber's actions in restricting the ability of clients to select specific drivers or schedule time with them are an unlawful interference with the independent relationship between clients and drivers. Plaintiff asserts that as independent contractors, drivers should have the option to work directly with customers without interference from Uber, and that Uber's refusal to allow such arrangements is inconsistent with the platform's supposed neutrality. Moreover, Uber's refusal to permit cash payments between drivers and clients further restricts this independent relationship and is an unlawful interference. Plaintiff requests an order allowing drivers and clients to engage in direct transactions, including allowing cash payments and eliminating Uber's interference in those transactions, with the exemption of Uber collecting at some point the agreed fee for Uber platform's services.

7. **Request for Injunction Regarding Judicial Review Before Permanent Disconnection**

Plaintiff realleges and incorporates by reference all preceding paragraphs.

Plaintiff requests that the Court issue an injunction requiring Uber Technologies, Inc. to provide drivers with the option of having offered contracts with speculated mandatory judicial review before any permanent disconnection or removal from the platform. Currently, Uber has the unilateral ability to disconnect drivers without providing sufficient due process or the opportunity for drivers to challenge such disconnections. Plaintiff asserts that this practice is unfair and does not provide adequate protections for independent contractors. Therefore, the Plaintiff seeks an order requiring that any disconnection from the Uber platform be governed by a contract stipulating arbitration by a third party, followed by mandatory judicial review, to ensure fairness and due process for drivers, as independent contractors.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

**CLASS ACTION DEMAND**

Plaintiff, **Dan Andreiu**, in his capacity as **Plaintiff in pro per**, demands the certification of this action as a **Class Action** pursuant to **Federal Rule of Civil Procedure 23**, and further states as follows:

1. **Class Definition**:

This class action is brought on behalf of the following individuals:

- **All Uber and Lyft drivers** who were not paid the tip promised by the platform upon accepting a ride or delivery, or who were not paid for services rendered in accordance with the platform's policies.

- **All Uber and Lyft drivers** who have been subjected to an imposition of a fiduciary duty under the "Terms of Service" by the Defendants.

- **All Uber and Lyft drivers** who have experienced psychological abuse, harassment, or coercion through constant, threatening messages from the platform, which are effectively orders under the threat of disconnection from the platform, at Defendants' Uber whim!

2. **Numerosity**:

The proposed class is so numerous that individual joinder of all members is impracticable. The class is estimated to include **thousands to millions of drivers** who have been subjected to the conditions described herein.

3. **Commonality**:

There are questions of law and fact common to the class, including but not limited to:

- Whether Defendants' practices regarding tips violate the rights of drivers under applicable federal and state wage laws.

- Whether Defendants' "Terms of Service" impose an unlawful fiduciary duty on drivers, or violate their rights as independent contractors.

- Whether Defendants' messaging practices constitute psychological abuse or harassment under applicable labor and consumer protection laws.

- Whether Defendants' threat of disconnection without due process violates drivers' rights to fair treatment.

4. **Typicality**:

The claims of the Plaintiff are typical of the claims of the class, as all class members have

been subjected to the same or similar unlawful practices.

5. **Adequacy**:

Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no

conflict of interest with the class members and will vigorously pursue this action.

6. **Predominance and Superiority**:

The common legal and factual issues in this action predominate over any individual

issues, and a class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

**Plaintiff respectfully requests that the Court certify this matter as a class action and
proceed with the litigation on behalf of the class as defined above.**

---

**Dated this January 10, 2025.**

**Respectfully submitted,**

**DAN ANDREIU**
Plaintiff, Pro Se
Phone: (310) 414-7177
Mailing address: **P.O. Box 93562, Los Angeles, CA 90093**

Verified Complaint

Class Action Statue and Jury Trial demanded - 14

**VERIFICATION**

I, DAN ANDREIU, certify under penalty of perjury under the laws of the State of California that the facts stated in this Complaint are true and correct to the best of my knowledge, and that the Exhibits and Attachments are true copies of the originals.

**Dated this January 10, 2025.**

_____

**DAN ANDREIU**
Plaintiff, Pro Se

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 2

**Fw: A message from Uber**

dan highendcars.com
Dan Andreiu
Sat, Dec 14, 2024, 9:10 PM

Get Outlook for iOS

**From:** Uber Support <contact_01316fb4-5d2b-480f-9b30-d374e56f139b@email-support.uber.com>
**Sent:** Saturday, December 14, 2024 2:43:47 PM
**To:** dan highendcars.com <dan@highendcars.com>
**Subject:** A message from Uber

Support

**NO RESPONSE NEEDED**

# A message from Uber

Hi Dan,

We're contacting you following some feedback we received about one of your delivery on December 13th, 2024. A customer gave feedback that an argument with you made them feel uncomfortable.

We wanted to share this feedback with you and emphasize the importance of remaining respectful while using the app, per our Community Guidelines. Multiple reports like this may result in losing access to the Uber app.If you disagree with this feedback, you're welcome to share your own feedback by replying to this message. If you have a relevant recording, let us know and we can share a link that will let you upload your recording.

You can record your order delivery with the app. In some areas, we'll let your customer know that the order is being recorded to help encourage respect and prevent false accusations. If you ever report a safety issue, you can choose to include a recording. Our Support team can only review recordings that you attach to a report. Go to this resource to learn more about your recording options and how to set it up.

Thank you for your understanding.

Go to the conversation

This message was sent by Haogoumang from Uber support. Continue this conversation by replying to this email or clicking on the above button.

**Have questions? Visit our Help Center.**

Help Center                    Privacy

Terms                          Email Preferences

Uber Technologies
1725 3rd St., San Francisco, CA 94158
Uber.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 3

Verified Complaint

Class Action Statue and Jury Trial demanded – 20

